UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| PATRICIA COURTS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:17-cv-00944 |
| | ) | Judge Trauger |
| | ) | Magistrate Judge Brown |
| CORRECT CARE SOLUTIONS, LLC, | ) | Jury Demand |
| | ) | |
| | ) | |
| Defendant. | ) | |

To: The Honorable Aleta A. Trauger, United States District Judge

## REPORT AND RECOMMENDATION

Pending before the Court is Defendant's motion for summary judgment. (Doc. No. 42). For the reasons stated below, the Magistrate Judge **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE**.

### I. BACKGROUND

Plaintiff, Patricia Courts, proceeding *pro se* and *in forma pauperis*, filed this action against Defendant, Correct Care Solutions, LLC, asserting claims for employment discrimination in violation of the Age Discrimination in Employment Act and Title VII of the Civil Rights Act of 1964. (Doc. Nos. 1, 22). Plaintiff alleged discrimination based on age, race and retaliation. (Doc. No. 22, p. 16). The District Judge adopted the undersigned's Report and Recommendation to partially grant Defendant's motion to dismiss. (Doc. Nos. 29, 30). As a result, the only remaining claim was a Title VII claim of retaliation "for reporting a co-worker's offensive

statements." (Doc. No. 29, p. 20).

On April 3, 2019, Defendant filed a motion for summary judgment (Doc. Nos. 42, 43) on the remaining Title VII retaliation claim, contending that (1) Plaintiff cannot establish a *prima facie* case of Title VII retaliation as a matter of law and (2) that Plaintiff has failed to offer evidence of retaliatory intent. (Doc. No. 42, p. 1). Pursuant to Local Rule of Court 56.01, Defendant contemporaneously filed a Statement of Undisputed Material Facts. (Doc. No. 44). Plaintiff filed a timely response to summary judgment (Doc. No. 45), and following the undersigned's Order directing Plaintiff to Local Rule 56.01 (Doc. No. 49), Plaintiff submitted a Response to Defendant's Statement of Undisputed Material Facts (Doc Nos. 50-52), to which Defendant responded. (Doc. Nos. 53-54).

## II. SUMMARY OF PERTINENT FACTS

Defendant, Correct Care Solutions, LLC ("CCS"),[1] was a healthcare company that primarily contracted with government entities to arrange for healthcare for inmates at federal, state, and local correctional facilities. (Doc. No. 50, Pl. Resp. to Def.'s Statement of Undisputed Material Facts, ¶ 3). After starting as a temporary contractor in June 2015, Plaintiff, Patricia Courts was hired as a Contract Specialist in CCS's Network Development department in November 2015. (Doc. No. 50, ¶ 1). Contract Specialists help develop and manage relationships with targeted hospitals and providers, who enter into contracts to treat inmates from local jails and state and federal prisons. (Doc. No. 50, ¶ 4; *see also* Plaintiff Deposition, Ex. 3). Plaintiff performed those duties, in addition to other "interim director" and customer service duties. (Doc. No. 50, ¶ 5).

In early July 2016, Plaintiff overheard her co-worker Duncan Gibson state on three separate occasions that he was a "redneck" and that it was "stupid to have a female for president,

---

[1] Correct Care Solutions, LLC is now part of Wellpath, LLC. (Doc. No. 42-2, ¶ 2).

especially Hillary Clinton." (Doc. No. 50, ¶¶ 7-8).[2] As an African American woman, Plaintiff found the comments offensive and reported Gibson's comments to her direct supervisor, Tracy Blair, and they discussed the comments. (Doc. No. 50, ¶¶ 9-10). After that meeting, Plaintiff sent an email on July 11, 2016 to Blair thanking him for addressing the comments with Gibson. (Doc. No. 42-1, p. 46).[3] Plaintiff also included in the email that she was "doing work at one time or another equated to the contractor, senior manager, and director position in this department" and copied the head of the Network Development department, Vice President Kenya Adams. *Id*. Plaintiff alleges that this director and manager work was a form of retaliation by Adams for reporting the "redneck" comments. (Doc. No. 42-1, p. 17). Plaintiff also alleges that she was later given customer service work, which no other Contract Specialists had to do, as a retaliation for reporting the "redneck" comments. (Doc. No. 52, Pl. Aff., ¶ 8).

Between July 11 and July 15, 2016, Adams, who is African American, met with Blair and Plaintiff to discuss the "redneck" comments, the extra work Plaintiff was doing, and a raise or promotion requested by Plaintiff. (Doc. No. 50, ¶¶ 17-18). Adams summarized the meeting in a July 15 email. (Doc. No. 42-1, p. 45). Adams reported that Gibson was to "refrain from using such terms" and that Plaintiff was not eligible for a raise because raises occur in conjunction with annual reviews, which would not occur until November for Plaintiff. (Doc. No. 50, ¶¶ 19-20). In fact, Plaintiff did get a raise with her annual review, but that did not occur until March of the following year. (Doc. No. ¶ 30). In response to Plaintiff's complaint about increased work, which she contends was a report of retaliation, Adams advised Plaintiff on resources for work-

---

[2]Specifically, Gibson stated "I'm a redneck," "Yes, my dad was born and bred in Alabama and I'm a real redneck," and "Yes, you know how we do." (Doc. No. 50, ¶ 6).

[3]Unless otherwise stated, citations are to the Court's ecf pagination.

life balance and told Plaintiff that she should "always be willing to step in and help" other team members. (Doc. No. 50, ¶¶ 21-22). Notably, Adams' email does not make a connection between the increased work and Plaintiff reporting the "redneck" comments, (Doc. No. 50, ¶ 19), so Plaintiff's affidavit is the only evidence supporting Plaintiff's contention that retaliation was discussed in the meeting with Adams and Blair. (Doc. No. 52, ¶ 6).

After the meeting, Plaintiff alleges that she faced retaliation for reporting the increased workload as retaliation. (Doc. No. 50, ¶ 24). Plaintiff contends that CCS "significantly decreased" her contracting workload. (Doc. No. 50, ¶ 24). In August, less than a month after the July 15 email, Kenya Adams reorganized those people into two teams: one primarily for Federal Bureau of Prisons ("FBOP") contracts and one primarily for jail and prison ("JAILS") contracts. (Doc. No. 42-2, ¶¶ 3-5). In her Declaration, Adams maintains that the reorganization was to "streamline and improve efficiencies within Network Development." (Doc. No. 42-2, ¶ 5). Adams assigned Gibson and Paulo Viteri to the FBOP team and the other Contract Specialists, including Plaintiff, Pamela Cane, and Bart Cunningham, to the JAILS team. (Doc. No. 50, ¶ 27). Viteri, who had previous experience with FBOP contracts at a competitor, joined the Network Development team to work on FBOP contracts (Doc. No. 50, ¶¶ 25, 27), and his addition siphoned off FBOP contracts from JAILS team members. (Doc. No. 42-2, p. 6). In the remainder of the year after Viteri joined in August, Plaintiff executed fewer FBOP contracts than Pamela Cane, one of her JAILS co-workers, but just as many contracts (9) as her other JAILS co-worker: Bart Cunningham. *Id.*

In her 2016 annual review in March 2017, Adams noted that Plaintiff was "in line with the contract productivity standards, in that she is able to execute contract requests within a reasonable time." (Doc. No. 50, ¶ 30). Furthermore, Plaintiff's number of executed contracts (133) was "slightly

4

above the department average in 2016." *Id.* She received a 1.5% raise for "Meeting Standards." (Doc. No. 50, ¶ 30).

Plaintiff was discharged on Monday, May 15, 2017. (Doc. No. 50, ¶ 33). Plaintiff alleges that she informed management on the preceding Friday, May 12, 2017 that she was going to file an Equal Employment Opportunity Commission (EEOC) complaint due to her decreased workload following her initial retaliation complaint in July 2016. (Doc. No. 52, ¶ 28). A meeting was scheduled for Monday to discuss the complaint with only Pamela Cane and Adams attending with Plaintiff. (Doc. No. 52, ¶ 16). The other two women were "much larger and aggressive" and became "verbally hostile." (Doc. No. 52, ¶ 17). Plaintiff left the meeting and the office after the "retaliatory meeting," and was discharged later that day, allegedly for job abandonment and insubordination. (Doc. No. 50, ¶ 34). Plaintiff filed a Charge of Discrimination ("Charge") with the EEOC, which issued a Dismissal and Notice of Rights on May 24, 2017. (Doc. No. 22, p. 15).

### III. STANDARD OF REVIEW

To prevail on a motion for summary judgment, the movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a "reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The movant may successfully support its motion by showing that "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To defeat the motion, the nonmovant must provide more than "a mere 'scintilla' of evidence in support of [her] position." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (citing *Anderson*, 477 U.S. at 252). Finally, "[w]hen ruling on a motion for summary judgment, a court must

consider the evidence 'in the light most favorable to the party opposing the motion.'" *Risher v. Lappin*, 639 F.3d 236, 239 (6th Cir. 2011) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986)).

## IV. ANALYSIS

### A. Procedural Deficiencies in Plaintiff's Summary Judgment Responses

As a preliminary matter, Plaintiff did not abide by Local Rule 56.01 in either her Response to the Defendant's Statement of Undisputed Facts (Doc. No. 50) or her Statement of Undisputed Material Facts, (Doc. No. 51). By not responding clearly with "undisputed, undisputed for the purpose of summary judgment or disputed," as requested in the undersigned's Order (Doc. No. 39), Plaintiff seems to dispute facts that she identified as "undisputed." (Doc. No. 50, paragraph 31). Additionally, instead of clarifying her position in her Statement of Undisputed Material Facts, Plaintiff cited to exhibits not in the record. (Doc. No. 51, paragraphs 1-6, p. 2).[4]

While *pro se* complaints are liberally construed, *Williams v. Curtin*, 631 F.3d 380, 383 (6th Cir. 2011), "federal courts 'have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel.'" *Branham v. Micro Comput. Analysts*, 350 F. App'x 35, 38 (6th Cir. 2009) (quoting *McNeil v. United States*, 508 U.S. 106, 113 (1993)). Furthermore, as Defendant points out, "[Federal Rule

---

[4] Plaintiff provides a list of exhibits with her affidavit (Doc. No. 52, p. 10) and references the list in both her affidavit and her Statement of Undisputed Material Facts. However, many of the exhibits were attached to her original complaint, not the Amended Complaint as she contends. (Doc. No. 52, paragraph 5). Exhibit B, which was attached to the amended complaint, is the only Plaintiff exhibit left standing in the record used at this summary judgment stage. *See Fla. Dep't of State v. Treasure Salvors, Inc.*, 458 U.S. 670, 702 (1982) ("[O]nce accepted, an amended complaint replaces the original."); *see also Parry v. Mohawk Motors of Mich., Inc.*, 236 F.3d 299, 306 (6th Cir. 2000) (holding that the amended complaint supersedes all previous complaints and controls the case moving forward.).

6

of Civil Procedure] 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary judgment." *Williamson v. Aetna Life Ins. Co.*, 481 F. 3d 369, 379 (6th Cir. 2007). These procedural issues are not dispositive, but they have the effect of significantly limiting the universe of facts supporting Plaintiff's *prima facie* case and pretext argument. *See Matthews v. Copeland*, 286 F. Supp. 3d 912, 915-16 (M.D. Tenn. 2017) (upholding summary judgment where the nonmovant knowingly decided not to file a separate statement of undisputed facts).

### B. Title VII Retaliation Claims

Title VII prohibits an employer from retaliating against an employee that has "opposed" any unlawful employment practice under Title VII or against any employee that has complained of or sought remedies for unlawful employment discrimination. 42 U.S.C. § 2000e-3(a); *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 342 (2013). Where, as here, the Plaintiff provides no direct evidence of retaliation, the Court assesses the Plaintiff's claims using burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), as modified by *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). A plaintiff must first establish a *prima facie* case of retaliation, then the burden shifts to the defendant to proffer a non-discriminatory reason for its actions. *Morris v. Oldham Cty. Fiscal Court*, 201 F.3d 784, 792-93 (6th Cir. 2000) (citing *McDonnell Douglas*, 411 U.S. at 802). If the defendant does so, the plaintiff must show that the proffered reason is mere pretext. *Id.* (citing *Burdine*, 450 U.S. at 256).

To establish a *prima facie* case of retaliation, Plaintiff must demonstrate that she (1) "engaged in activity protected by Title VII; (2) her exercise of such protected activity was known by the defendant; (3) thereafter, [CCS] took an action that was 'materially adverse' to the

7

plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action." *Mys v. Michigan Dep't of State Police*, 886 F.3d 591, 599-600 (2018) (quoting *Laster v. City of Kalamazoo*, 746 F.3d 714, 729-30 (6th Cir. 2014)).

For the sake of clarity, the undersigned will address Plaintiff's three discernable theories of retaliation separately

### 1. Increased workload after reporting Duncan Gibson's comments

Plaintiff alleges that reporting Gibson's "redneck" comments to Tracy Blair was protected activity, and that Kenya Adams and "management" subsequently increased Plaintiff's workload by asking her to perform duties for directors and managers, unlike other Contract Specialists. (Doc. No. 22, ¶ 29).[5] Defendant argues (1) that Plaintiff engaged in a protected activity, (2) that the increased workload was a materially adverse employment action, and (3) that reporting the possible hostile work environment caused the increased workload. (Doc. No. 43, pp. 7-12). These final two arguments prove fatal for Plaintiff's *prima facie* case under this theory of retaliation.

Plaintiff correctly points out that communicating a belief that an employer has engaged in employment discrimination virtually always qualifies as protected opposition. *Crawford v. Metro. Gov't of Nashville & Davidson County*, 555 U.S. 271, 276 (2009). Furthermore, to qualify as protected opposition under Title VII, a person expressing opposition to an alleged illegal discriminatory practice must merely have a "reasonable and good faith belief" that the practice is unlawful. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 578 (6th Cir. 2000) (citing *EEOC Compliance Manual*, (CCH) ¶ 8806 (as amended, *EEOC Compliance Manual*, § 2-

---

[5]Plaintiff also claimed in her EEOC Charge that she "was assigned the workload of the Director" in January 2017. (Doc. No. 22, p. 16).

II(A)(5) (May 12, 2000); *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1312-13 (6th Cir. 1989). However, the undersigned need not decide the reasonableness of Plaintiff's belief that Gibson's comments created a hostile work environment because Plaintiff cannot establish the third element of her *prima facie* case.

In support of the third element, Plaintiff argues that she experienced an adverse employment decision when the head of the department, Kenya Adams, started increasing her work in retaliation for reporting Gibson's comments. (Doc. No. 42-1, p. 17). According to Plaintiff, Gibson's comments, Plaintiff's opposition, and CCS management's retaliation occurred sometime before Plaintiff sent the July 11 email. (Doc. No. 42-1, pp. 11-12, 16-17). In that email, Plaintiff writes she was "doing work at one time or another equated to the contractor, senior manager, and director position in this department" and asks for a raise or a promotion because of the extra work. (Doc No. 42-1, p. 46).

To establish that an employment action is "materially adverse" and thus satisfies the third element, 'a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, which . . . means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Laster v. City of Kalamazoo*, 746 F.3d 714, 731 (6th Cir. 2014) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)). As this court stated in *Ford v. GMC*, 305 F.3d 545, 553 (6th Cir. 2002),

> [a] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation.

Defendant correctly points out that the "Sixth Circuit has never held that temporarily

9

increasing an employee's workload is a materially adverse employment action." *Lyons v. Vanderbilt Univ.*, No. 3:14-cv-1906, 2015 U.S. Dist. LEXIS 166315, at *18-19 (M.D. Tenn. Dec. 11, 2015) (citing *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 450 (6th Cir. 2004) (holding that assigning difficult workload was not materially adverse). Plaintiff's increase was not more than "an alteration of job responsibilities" and does not suffice as materially adverse. *See Ford*, 305 F.3d at 553. Without something more, like a change in salary or evidence of the number of cumulative hours she was required to work, Plaintiff cannot establish a materially adverse employment action. *See Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996) ("Reassignments without salary or work hour changes do not ordinarily constitute adverse employment decisions in employment discrimination claims."). Plaintiff concedes that she was given a raise based on her performance during the time in question. (Doc. No. 50, ¶ 21). She also provides no evidence that she had to work more hours or that the managerial duties would "dissuade a reasonable worker from supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68; (Doc. No. 50, ¶¶ 21, 30).

### 2. Retaliation for reporting increase in workload

Plaintiff also argues that she faced retaliation for reporting the increased workload as retaliation. (Doc. No. 50, ¶ 24). Plaintiff contends that this retaliation came in the form of decreased contracting work sometime after the meeting with Adams and Blair in mid-July 2016. (Doc. No. 50, ¶ 24). Even drawing all reasonable inferences in favor of Plaintiff to assume that she reasonably believed that she was opposing an unlawful employment practice, *see Johnson*, 215 F.3d at 578, and that she did report the increased workload as retaliation, (Doc. No. 42-1, p. 17), Plaintiff cannot establish that reporting the first instance of retaliation caused a materially adverse employment action that would establish a claim for this second instance of retaliation.

Furthermore, she cannot establish that CCS's proffered reason for the decrease in her FBOP contracting work was pretextual.

As in the first possible instance of retaliation, Plaintiff argues that a change in work responsibilities was a materially adverse employment action. (Doc. No. 50, ¶ 24). Unlike the first instance, it is undeniable that Courts saw her share of the FBOP contracts drop after CCS brought Paulo Viteri to Network Development in August. (Doc. No. 42-2, p. 6). However, she still cannot demonstrate any decrease in salary or adverse impact from the decrease in FBOP contracts. In fact, her performance review indicates that she was "in line with the contract productivity standards" and executed seven more contracts than the department average in 2016. (Doc. No. 42-1, p. 47). Without more, the mere change in responsibilities within the department is not sufficient to create a genuine issue of material fact over whether there was an adverse employment action. *See Kocsis*, 97 F.3d at 885.

Plaintiff also cannot prove that there was a causal link between reporting retaliation and the decrease in FBOP work. For the fourth element, a plaintiff must provide proof of but-for causation by showing that "the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 360. To determine whether a causal relation exists, courts consider whether "the employer treated the plaintiff differently from similarly situated individuals and whether there is a temporal connection between the protected activity and the retaliatory action." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 516 (6th Cir. 2009). As Defendant argues, in the Sixth Circuit, "temporal proximity between an assertion of Title VII rights and an adverse employment action provides highly probative evidence of a causal connection, [but] 'temporal proximity alone will not support an inference of retaliatory discrimination when there is no other compelling

evidence.'" *Arendale v. City of Memphis*, 519 F.3d 587, 606 (6th Cir. 2008) (quoting *Nguyen v. City of Cleveland*, 229 F.3d 559, 566 (6th Cir. 2000). In this case, other Contract Specialists, Pamela Cane and Bart Cunningham, also saw their shares of FBOP contracts decrease; in fact, Ms. Courts executed the same number of contracts (9) as Bart Cunningham after Viteri started in August 2016. (Doc. No. 42-2, p. 6). Plaintiff provides no other evidence to support causation besides the short period of time between the meeting with Adams and Blair and the decrease in FBOP contract work in August. (Doc. No. 42-2, p. 6). That temporal proximity alone is insufficient to demonstrate that but-for causation, especially where there is a legitimate, nondiscriminatory rationale for the decrease in workload. *See Arendale*, 519 F.3d at 606.

Finally, even if Plaintiff could establish a causal connection and complete a *prima facie* case, the claim still fails because she cannot establish pretext. Because CCS proffers a legitimate, nondiscriminatory reason for the decrease in FBOP work, (Doc. No. 43, p. 13-14), Plaintiff must produce "enough evidence to . . . rebut, but not to disprove [CCS's] proffered rationale." *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 651 (6th Cir. 2015) (citing *Shazor v. Prof'l Transit Mgmt., Ltd.*, 744 F.3d 948, 957 (6th Cir. 2014). Plaintiff can do so "by showing (1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the decreased workload], or (3) that they were *insufficient* to motivate [the decrease]." *Id. (*emphasis in original) (citing *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 349 (6th Cir. 2012)).

As its proffered rationale, CCS has put forth evidence showing that Adams reorganized the Network Development department into two teams focusing separately on state and local prisons and federal prisons in order to "streamline and improve efficiencies within Network Development." (Doc. No. 42-2, ¶ 5, p. 6). CCS put an employee with previous FBOP experience

(Viteri) on the FBOP team and funneled that work to that experienced team, not the JAILS team, where Plaintiff was placed. (Doc. No. 50, ¶¶ 25, 27). To rebut CCS's rationale, Plaintiff avers that restructuring the Network Development department into FBOP and JAILS teams was "pretext for retaliation of the significant increase (after reporting EEO concern) and subsequent decrease in Plaintiff's workload (after reporting retaliation) and termination (after informing of filing EEOC complaint)." (Doc. No. 50, ¶ 24). Plaintiff offers no evidence to show that retaliation actually motivated Adams and CCS to create two different teams and put Viteri on the FBOP team instead of her. Plaintiff points out that she was doing FBOP contracting work before Viteri, but Adams put Viteri on the FBOP team instead. (Doc. No. 52, ¶ 11; Doc. No. 42, p. 36-37). However, as mentioned above, others also had FBOP experience and were moved to the JAILS team. (Doc. No. 50, ¶ 25). The undersigned will not substitute his judgment for management's regarding the efficiency of the department, and Plaintiff does not provide evidence requiring him to do so. *See Lockett v. Marsh USA, Inc.*, 354 Fed. Appx. 984, 995 (6th Cir. 2009) (holding that an employee's demotion during a company reorganization was not evidence of pretext); *see also Smith v. Leggett Wire Co.*, 220 F.3d 752, 763 (6th Cir. 2000) ("[I]t is inappropriate for the judiciary to substitute its judgment for that of management.").

### 3. Retaliatory discharge after informing CCS of intent to file EEOC Charge

Throughout her summary judgment responses, Plaintiff asserts a new theory of retaliation centering on her alleged retaliatory discharge. (Doc. Nos. 51-52). Plaintiff argues that she was discharged because she told Defendant in the May 15 meeting that she was going to file an EEOC complaint. (Doc. No. 51).

This Court already dismissed Plaintiff's retaliatory discharge claim (Doc. No. 29, p. 20), and this Circuit has repeatedly held that a plaintiff may not expand her claims to assert a new

13

theory in response to a summary judgment motion. *See Tucker v. Union of Needletrades, Indus., & Textile Emps.*, 406 F.3d 784 (6th Cir. 2005) (holding that allowing a plaintiff to make a new claim at the summary judgment stage would subject defendants to unfair surprise). The proper place to assert this new theory was in the complaint, which should give "defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). If a plaintiff has a new claim based on facts that arise in discovery, the proper procedure is to amend the complaint, per Fed. R. Civ. P. 15(a). *Carter v. Ford Motor Co.*, 561 F.3d 562, 568 (6th Cir. 2009).

Plaintiff missed the boat by not arguing this claim earlier. In the original complaint (Doc. No. 1) and in the amended complaint (Doc. No. 22), Plaintiff neglected to plead that her firing was in retaliation for telling CCS that she intended to file an EEOC complaint.[6] She also did not seek leave amend the complaint again to include this new retaliation theory.[7] Defendant filed its summary judgment motion and proceeded through discovery based on the claims in the amended complaint, and allowing Plaintiff to submit a new theory at the summary judgment stage would be prejudicial and deprive Defendant of fair notice.[8] *See Twombly,* 550 U.S. at 555.

---

[6]Plaintiff also did not include this theory of retaliation in her original EEOC Charge. (Doc. No. 22, p. 16).

[7]Plaintiff did seek leave to amend the original complaint, but did not do so for the amended complaint. (Doc. No. 17).

[8]Plaintiff also mentions numerous times that CCS has not produced documents explaining why she was discharged. (Doc. No. 52, ¶ 30-36). The deadline for discovery motions was March 3, 2019. (Doc. No. 33). Plaintiff's complaints about lack of discovery do not warrant a deferral or extension under Fed. R. Civ. P. 56(d) because they relate only to the reasons for her firing, which is not a valid theory of liability at this stage of the case.

## V. CONCLUSION

Accordingly, for the reasons above, the Magistrate Judge **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED** and that this action be **DISMISSED WITH PREJUDICE.**

The parties have fourteen (14) days after being served with a copy of this Report and Recommendation ("R&R") to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 155 (1985).

**ENTERED** this 30th day of July, 2019.

/s/   Joe B. Brown
JOE B. BROWN
United States Magistrate Judge